William LAWHORN, Plaintiff,

v.

Jack R. DUCKWORTH, Dr. Weldon Cooke and James Wilkins, Defendants.

Civ. No. S 84–463.

United States District Court, N.D. Indiana, South Bend Division.

Dec. 15, 1987.

Cheryl Stephan, LaPorte, Ind., for plaintiff.

William Lawhorn, pro se.

Robert B. Wente and Kimberlie A. Forgey, Indianapolis, Ind., for defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

The complaint in this case was originally filed *pro se* on July 30, 1984, by the plaintiff, William Lawhorn, purporting to state a claim under 42 U.S.C. § 1983, and invoking this court's jurisdiction under 28 U.S.C. §§ 1331, 1343(3) and (4). This court appointed Cheryl Stephan, an attorney from LaPorte, Indiana, as counsel for plaintiff on July 1, 1985. The defendants filed a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure on October 26, 1987. That motion is now ripe for ruling.

### I.

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *accord, Arkwright–Boston Mfg. Mutual Ins. Co. v. Wausau Paper Mills Co.,* 818 F.2d 591, 593 (7th Cir.1987). A material question of fact is a question which will be outcome-determinative of an issue in that case. *Big O Tire Dealers, Inc. v. Big O Warehouse,* 741 F.2d 160, 163 (7th Cir.1984).

Recently the Supreme Court of the United States took the opportunity to address Rule 56 of the Federal Rules of Civil Procedure. In two cases decided on the same day, the Court has expanded the scope of

the application of Rule 56. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *Celotex* addressed the initial burdens of the parties under Rule 56, and *Anderson* addressed the standards under which the record is to be analyzed within the stricture of Rule 56.

After *Celotex* it is clear that a non-moving party may not rest on its pleadings to avoid summary judgment. *Celotex,* 106 S.Ct. at 2554. See also *Catrett v. Johns–Manville Sales Corp.,* 826 F.2d 33 (D.C.Cir. 1987). The initial burden is on the moving party to demonstrate " 'with or without affidavits' " the absence of a genuine issue of material fact, and that judgment as a matter of law should be granted in the moving party's favor. *Id.* 106 S.Ct. at 2553; *Arkwright–Boston, supra* at 593. Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine [material] issue for trial.' " *Id.; Arkwright–Boston, supra* at 593. Further, in *Anderson,* the Court held that what facts are material in a specific case shall be determined by the substantive law controlling that case or issue. *Anderson,* 106 S.Ct. at 2510. In addition, the Court went on to interpret Rule 56 as requiring that the courts analyze summary judgment motions utilizing the standard of proof relevant to that case or issue. *Id.* at 2512–2513. For recent academic insight into *Celotex* and *Anderson,* see Childress, *A New Era For Summary Judgments: Recent Shifts at the Supreme Court,* 116 F.R.D. 183–194 (1987). At page 194 thereof, the author states:

"The recent Supreme Court cases likely require that summary judgment be more readily granted.... [t]his emerging trend signals a new era for summary judgments, one in which the old presumptions are giving way to a policy of balancing and efficiency, and the mechanism is more appropriate to double as a sufficiency motion—allowing some sort of trial itself on the paper record."

For the judicial epilogue of *Celotex,* see *Catrett v. Johns–Manville Sales Corp.,* 826 F.2d 33 (D.C.Cir.1987).

The docket sheet in this case readily discloses that these proceedings have been extensive, and the contents of the motion for summary judgment indicate that the various incidents of medical attention being administered to the defendant are also extensive.

## II.

The Eleventh Amendment to the Constitution of the United States states:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

These defendants are each and all entitled to Eleventh Amendment immunity for all claims for money damages asserted here in their official capacities. See *Kashani v. Purdue University, et al.,* 813 F.2d 843 (7th Cir.1987), *cert. denied,* 484 U.S. 846, 108 S.Ct. 141, 98 L.Ed.2d 97 (1987); *Owen v. Lash,* 682 F.2d 648 (7th Cir.1982); and *Sheets v. Indiana Dept. of Corrections,* 656 F.Supp. 733 (S.D.Ind.1986).

## III.

The plaintiff alleges in the complaint that on June 16, 1982, and August 12, 1982, he was denied previously prescribed medication by physicians. He further alleges that on October 21, 1982, and on other unspecified dates, he was administered placebo, in lieu of necessary medications. The defendants are Dr. Weldon J. Cooke, a staff physician employed at the Indiana State Prison (hereafter "I.S.P."), James Wilkins, a medical technician employed at the Indiana State Prison, and Jack R. Duckworth, Superintendent of the I.S.P.

The allegations asserted against defendant Duckworth fail to allege the necessary personal involvement, as required in *Rascon v. Hardiman,* 803 F.2d 269 (7th Cir.1986), and *Adams v. Pate,* 445 F.2d 105 (7th Cir.1971). For that reason alone, and

understanding the mandates of *Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), the complaint as against defendant Duckworth fails to state any claim for relief.

■ Contained in the plaintiff's brief, beginning at the bottom of page two, and running through to most of page 66, there is a massive detailed accounting of the various medical conditions of the plaintiff, and an equally detailed accounting of the massive treatments that have been administered to him. The *facts* asserted and summarized there are before the court without serious dispute. The court has before it the depositions of the plaintiff, Dr. Cooke, Mr. Duckworth, Dr. Hoit, John M. Sharp, Ronald L. Batchelor, Lee Kroehler, and defendant James Wilkins. It is also readily apparent that many of the plaintiff's physical problems pre-dated the onset of his incarceration at the I.S.P., which commenced on June 5, 1970, in addition to the applicable statute of limitations in this case, even assuming that the statute of limitations was a five-year statute of limitations, rather than the two-year statute of limitations. See *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1984); *Loy v. Clamme*, 804 F.2d 405 (7th Cir.1986); and *Anton v. Lehpamer*, 787 F.2d 1141 (7th Cir.1986).

The constitutional standard that must be applied to the claims made under the Eighth Amendment to the Constitution of the United States is that of deliberate indifference to serious medical needs, as established in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). See *Shockley v. Jones*, 823 F.2d 1068 (7th Cir. 1987); *Eades v. Thompson*, 823 F.2d 1055 (7th Cir.1987); *Meriwether v. Faulkner*, 821 F.2d 408 (7th Cir.1987). For examples of where deliberate indifference was actually found to exist in this court, see *Musgrove v. Broglin*, 651 F.Supp. 769 (N.D.Ind. 1986), and *Burris v. Kirkpatrick*, 649 F.Supp. 740 (N.D.Ind.1986).

In *Joseph v. Brierton*, 739 F.2d 1244 (7th Cir.1984), it was clearly held that a claim for medical malpractice is not enough to state an Eighth Amendment claim. Judge Posner described the necessary showing for such a claim as that of "willful neglect." See also *Duckworth v. Franzen*, 780 F.2d 645 (7th Cir.1985); and *Wells v. Franzen*, 777 F.2d 1258 (7th Cir.1985).

As early as 1961, prior to the outset of his incarceration in 1970, plaintiff first encountered stomach problems that required individual private medical attention. At that time, he was advised to discontinue consumption of alcohol, gambling and smoking, and to change and improve his eating habits. Consistent with human nature and experience, plaintiff tried but the temptations were too great. In 1967, plaintiff had major stomach surgery, while incarcerated on an earlier conviction. After being discharged from custody in 1980, he was convicted of dealing in cocaine and sentenced to 30 years. In October, 1980, plaintiff was assigned to the I.S.P. During his lifetime, plaintiff has more than 100 upper G.I. series (abdominal x-rays), at least 25 of which have been performed while incarcerated in facilities of the Indiana Department of Corrections.

Here, plaintiff contends that he was denied medications prescribed by non-Indiana state prison medical staff, and that he was at least once given a placebo in lieu of medically necessary medication. It is admitted, for purposes of this case, that Dr. Cooke refused to prescribe an order of Dalamane for him upon his return from Memorial Hospital, on June 16, 1982. This is a medical judgment that this court should not second-guess. Plaintiff further states that he has no complaint that he was refused any medications following his discharge from Memorial Hospital on August 12, 1982. He complains, however, that Dr. Cooke refused to provide him with Valium, as allegedly prescribed by Dr. Hoit on April 19, 1983. In regard to the giving of the placebos, the plaintiff claims that on October 21, 1982, when he reported to the infirmary complaining of nausea, dizziness and stomach pains, he was injected with a placebo by defendant Wilkins at Dr. Cooke's direction. Plaintiff states that he left the infirmary in pain, and encountered a Lieutenant Sharp, no relation to this judge, with

whom he returned to the infirmary. Once back at the infirmary, defendant Wilkins revealed a prescription for water to Lieutenant Sharp.

The plaintiff was admitted to Memorial Hospital on June 8, 1982, complaining of vomiting, dehydration, and a diagnosis of possible marginal ulcer. He was examined by a Memorial Hospital staff member, Dr. Saylors. While at Memorial, the plaintiff underwent an upper G.I. series. Dr. Saylors noted that a previously diagnosed ulcer was well healed and noted further that there was no scarring. An I.B.P. was conducted also at Memorial, which proved normal. The plaintiff was discharged by Dr. Saylors with no restriction on his diet or activity, and was prescribed Sinequan for the symptoms of abdominal pain. Plaintiff refused to take the medication while at Memorial. Doctor Saylors further stated that the plaintiff complained that Sinequan made him "jumpy." Plaintiff also received Dalamane while at Memorial. Subsequently, Dr. Saylors found nothing wrong with the plaintiff and discharged him.

While an offender is in the prisoner section of the Memorial Hospital located in Michigan City, Indiana, the normal relationship between the medical staff at Memorial and the one at the I.S.P. is that the latter are considered "treating physicians", and thus make decisions, including treatment and prescription of medications. Upon an offender's discharge from Memorial, however, the medical staff may list medications, either on the offender's "transfer form," or on the "discharge" form. These are only recommendations and notations made while the offender was under the care of the Memorial staff. Such medications were used and had been proved successful. Medicon, (Emetecon) is a medication used to treat nausea, which has never been available at the I.S.P. Neither was it available to the plaintiff upon his return to the I.S.P. on June 16, 1982. Dalamane is a sleep inducing medication (sleeping pill). Doctor Cooke stated that like Medicon, he did not believe it was available at the I.S.P. pharmacy. Doctor Cooke was under the professional opinion that plaintiff did not medically need such a sleep inducing medi-

cation upon his return to the I.S.P. on June 16, 1982. Doctor Cooke noted that Dr. Saylors recommended that upon discharge, there should not be limitations on activity or diet. Doctor Cooke was of the opinion that plaintiff should be ready to partake in the day-to-day activities of his usual life at the I.S.P. He additionally noted that Dalamane was on the list of controlled substances, and as a matter of course did not promote its use in the prison environment. Dr. Cooke admitted that sleeping pills were more frequently used in the hospital setting as opposed to the prison setting.

On April 19, 1983, the plaintiff was referred by Dr. Cooke to a consulting specialist in the area of dermatology, namely, Dr. Hoit. Doctor Cooke requested of Dr. Hoit to determine whether Valium was indicated for treatment of the plaintiff's conditions of herpes, and psoriasis. Doctor Hoit examined plaintiff on April 19, 1983, and diagnosed that plaintiff had Herpes II, and further explained that there was no medically known cure presently available for herpes. However, he stated that the serious condition has a self-limiting silver lining, in that the symptoms of blisters burning, redness and itching disappear in seven to 10 days after they appear. The only method known to medical science for treating the symptoms of herpes in 1983 was to try different methods and medications.

The recommended course of treatment in 1983 was wet soaks and drying by the use of Betadine, a boric acid solution, burrow solution, or potassium permanganate. The drying process would be followed by the use of topical creams. Currently, the recommended course of treatment for herpes is a drug known as Zovarax. Zovarax shortens the period of time during which the symptoms exhibit themselves. Doctor Hoit testified that his comments, as appearing on the referral form of April 19, 1983, where he set forth that Valium could be used to treat the "psychogenic flare-up", were only a suggestion, and not a prescription of any sort. Hoit stated that Valium is not a treatment for herpes, but only something to treat the emotional impact of having a flare-up. Hoit further stated that

in 1983, Valium was used only in rare cases to treat the distress that could adjoin the symptoms of herpes.

Doctor Hoit did not examine or treat plaintiff for psoriasis because either the plaintiff at the time of the appointment did not complain of that condition, or did not exhibit its symptoms. Doctor Hoit described the symptoms of psoriasis, and stated that only in very rare cases is psoriasis incapacitating to the extent that hospitalization is required. Hoit specified that this was not the case with plaintiff, and stated that like herpes, there is no cure and that the recommended course of treatment is the use of topical creams, sunlight, tars, antibiotics and photosynthesis. He further stated that the use of Valium to treat the symptoms of psoriasis is "not in the book", but, however, it may be worth a try to treat stress which might cause a flare-up of the symptoms. He emphasized that stress-induced flare-up is not predictable to the extent that it can be concluded that some individual stress will always result in the symptoms. The use of Valium is a matter of judgment of the treating physician.

Plaintiff complains that he did not receive Valium initially either before or after his referral appointment with Dr. Hoit. However, the record is undisputed that an I.S.P. medical officer either ordered or dispensed Valium to the plaintiff on May 31, 1983, April 16, 1982, April 29, 1983, May 12, 1983, May 19, 1983, May 26, 1983, and June 9, 1983. Plaintiff has now modified his complaint and stated that only after June 9, 1983 was he denied Valium.

In mid–1983, Valium, available as a medication, was curtailed at the I.S.P. as the result of a medical audit, which was performed by four I.S.P. physicians, the I.S.P. pharmacist, and other supporting medical staff members. The decision to remove Valium was based upon the determination that any benefit gained by its use was outweighed by the problems that its availability created. Doctor Cooke noted that Valium is a controlled substance and a very effective tranquilizer. He further noted that Valium is addictive and probably one of the most abused and over-prescribed medications in the 1970's. The determination to curtail the use of Valium at the I.S.P. related in part to its availability and the resulting problem of offenders hoarding that medication. There were examples of offenders overdosing on Valium and evidence of a considerable black market in it among the prison population. In addition to the generalized problem with prescribing Valium at the I.S.P., it was clearly Dr. Cooke's medical opinion that Valium was not required by the plaintiff. That view was supported at one time or another by Drs. Saylors, Galea, DeBerry, and Strefling.

Dr. Cooke did not dispute injecting a placebo into plaintiff on October 21, 1982, but rather offered an elaborate explanation of the treatment and professional reasoning process that led up to the use of the same. Basically, the examination found no organic basis for the pain complained of, and Dr. Cooke determined that such pain was "musculoskeletal". Cooke attempted to dispense a saline solution (placebo) to test the source of plaintiff's complaint. He indicated that such practice was medically proper. He further indicated that in many instances, if not most, the use of a non-medicative solution results in the patient's expression of relief. The actual use of a placebo in this case was only after the above set forth tests and examinations were performed, and a determination by Dr. Cooke had been made. In other words, it was made on the basis of his medical judgment.

This court has had the benefit of reviewing the entire medical record of the plaintiff. The attention and treatment provided to him has been massive, to say the least. Between December 3, 1981 and August 20, 1984, he was seen and examined by at least 20 different doctors. During the same period of time, plaintiff has had over 100 appointments with the I.S.P. medical staff at the infirmary. In an attempt to respond to his complaints, the various doctors have prescribed the following medications: Tagamet, Vitamin B, Mylanta, Maalox, Nubane, Thorazine, Atarax, Sinequan, Donnatol, Toectin, Tylenol with Codeine, Keflex,

**1506**

Zovarax, Ointments, Dalamane, Serzx, Betadine soap, Nalfon, Synalar Cream, Compazine, Erythromycin, Neosporin Ointment, Codeine, Valium, laxatives, Penicillin, Cleocin, Phenagan, Halcion, baby oil, Selsum shampoo, Rhegalin, Ativan, and Mylicon.

During this period of time, the plaintiff has been transferred to outside hospitals, including Memorial Hospital in Michigan City and Wishard Hospital in Indianapolis, on literally dozens of occasions. While a patient at these hospitals, the plaintiff has been the subject of numerous tests. In addition, plaintiff has failed to appear at the infirmary of the I.S.P. for many scheduled appointments, and has had abusive encounters with Drs. Saylors, Strefling, Cooke and Allen.

On September 27, 1983, plaintiff was examined by Dr. Galea, a consulting neurological specialist. Dr. Galea concluded in part "The patient is essentially plagued with a multitude of trivial, transient, intermittant symptoms.... I doubt any other neurological causes for his symptoms."

Given the recent teaching from the Supreme Court of the United States in the *Celotex* and *Liberty Lobby* cases, and understanding that the money damage claims asserted here can only be asserted against the defendants in their individual and not official capacities, and understanding the basic constitutional requirement of *Estelle v. Gamble, supra*, this case comes down to an argument about the exercise of medical judgment. The record, as massive as it is, absolutely precludes any possible inference of deliberate indifference, as defined in *Estelle* and its progeny in this circuit.

 This court is all too familiar with the generalized burden upon the officials at the I.S.P. with reference to the delivery of medical services under the Eighth Amendment of the Constitution of the United States. See this court's opinion in *Hendrix v. Faulkner*, 525 F.Supp. 435 (N.D.Ind. 1981), *aff'd in part and rev'd in part and rem. sub nom. Wellman v. Faulkner*, 715 F.2d 269 (7th Cir.1983). A claim grounded on a sincere disagreement with the type

and quality of diagnosis of treatment received does not rise to the level of constitutional deprivation under the Eighth Amendment. See this court's opinion in *Williams v. Duckworth*, 598 F.Supp. 9, 14–15 (N.D. Ind.1983). It is also important to note that the decisions of the Supreme Court of the United States in *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), and *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), which were originally decided in the context of claims brought within Section 1983 and bottomed on the Fourteenth Amendment of the Constitution of the United States, have been extended to claims brought under the Eighth Amendment of the Constitution of the United States. *Campbell v. Greer*, 831 F.2d 700 (7th Cir. 1987). In other words, claims that are purely based on negligence when brought under the Eighth Amendment, cannot be the basis for relief under § 1983.

For all of the foregoing reasons, the defendants' motion for summary judgment is GRANTED. Costs are assessed against plaintiff. IT IS SO ORDERED.